OPINION OF THE COURT
Julia I. Rodriguez, J.
The issue before the court is whether respondent should be permitted to maintain a satellite dish at the premises, where the lease states that “an aerial may not be erected on the roof or outside wall of the building.” After reference to federal and case law, the court finds that respondent may retain the dish *780 and not be compelled to switch to cable service at petitioner’s option.
Petitioner commenced the within holdover proceeding on the grounds that respondent was violating a substantial obligation of the tenancy by having installed a satellite dish (dish) without the landlord’s written consent. The petition states that the premises are rent stabilized and that the relevant predicate notices were served accordingly. The 10-day notice to cure informs respondent, in pertinent part, that (1) tenants are in violation of paragraphs 8 and 10 of the lease dated June 2, 1997, and (2) the violation must be cured by June 25, 2002 by removing the satellite dish from outside the apartment window.
Respondent appeared by counsel and interposed an answer of general denial and alleged inter alia a defense of waiver.
A trial was conducted in Part L on February 3, 2002.[1] Petitioner’s Director of Operations and Managing Agent, Ms. Patricia Shapiro (Shapiro), testified that she recently noticed that the manner of the dish’s installation had been changed. She stated that when it was originally installed in November 1997, the dish had been attached to a piece of wood bolted to the window guard, but that as of 2002, the satellite dish is attached to a piece of wood bolted to the window sill outside of the window guard. On cross-examination Ms. Shapiro stated that she observed the dish by standing on the sidewalk and looking upward to respondent’s window on the fourth floor, four stories above.
In her defense, respondent testified that in 1997 she inquired at the management office whether she could purchase satellite service and was directed to speak with Ms. Shapiro. Respondent claims that Shapiro agreed to the satellite dish, with the proviso that after it was installed the respondent would call management to schedule an inspection to ensure that it had been installed properly. Respondent testified that her father installed the dish by attaching it to a piece of wood which was then bolted to the window guard. Respondent then notified Shapiro that the dish was installed and scheduled an inspection. Respondent recalled that in November 1997 “the super, Carlos, and a gentleman from Asher Management” came to her apartment and inspected the dish to make certain that it was “put correctly and wasn’t going into the brick.” According to respondent, neither gentleman objected to the dish or its manner of installation and she never spoke with Shapiro again *781 regarding the dish. In addition, respondent testified that every year in June “Heydi” from the management office comes to inspect her apartment for recertification purposes. Respondent alleged that Heydi checks every room to make sure that everything is in order, including the windows, and that Heydi always observed both the subject window guard and dish. The respondent further alleged that Heydi has inspected her apartment annually from 1998 to present and never objected to the dish, and that its installation has never been changed.
On rebuttal, Shapiro denied ever speaking to respondent on the telephone with respect to the installation of a dish. However, Shapiro recalled that she went to the premises in the fall of 1997 with Heydi, the site managing agent, after she heard about the dish. Shapiro testified that the satellite dish was already in place, clamped to the window guard and secured to the inside of the apartment. Shapiro recalled telling respondent that she would “consider letting respondent keep the dish until the building was wired for cable,” but that once cable was available she would have to remove the dish “as it was not permitted.”
Shapiro alleged that thereafter she had no further conversations with respondent regarding the dish, and that she consented to the dish only until the building became cable ready and because of the way it was installed. Although Shapiro never asked respondent to remove the dish, she directed Heydi to inform respondent to remove the dish. Shapiro further stated that it took almost five years for the building to become cable accessible and that cable has only been available for the past two years.
Residential leases routinely bar or regulate a tenant’s right to install aerials and antennas. As the marketing of entertainment services via satellite proliferates, owners are compelled to seek enforcement of these prohibitive lease provisions in housing court. Since the subject of satellite dishes is regulated by federal law, the court turns to section 207 of the Telecommunications Act of 1996 (Pub L No. 104-104, 110 US Stat 56), commonly known as the “First OTARD Order,” referring to Over-The-Air Reception Devices. (47 CFR 1.4000 et seq., 11 Federal Communications Commission Records 19276 [FCCR] [1996].) Section 207 devices include antennas, satellite dishes or other instruments designed to receive video programming services. The First OTARD Order prohibited local and state governments, homeowners associations and contracting parties from restricting viewers’ installation and maintenance of sec *782 tion 207 devices. However, renters were not included in this favored class of viewers.
In 1998 the Federal Communications Commission issued an amendment to section 207 to include tenants with a leasehold interest in the property. (See Matter of Implementation of Section 207 of the Telecommunications Act of 1996, 13 FCCR 23874, CS Docket No. 96-83, FCC 98-273, Nov. 2, 1998.) Referred to as the “Second OTARD Order,” the amendment provides that:
“renters will be able, subject to the terms of our Section 207 rules, to install Section 207 reception devices wherever they rent space outside of a building, such as balconies, balcony railings, patios, yards, gardens or any other similar areas * * *
“[Ujnlike common areas, the leasehold (e.g. an apartment including a balcony or terrace) generally is under the exclusive use or control of one party (i.e., the lessee), thus enabling that party to address liability concerns. Moreover, state landlord-tenant law can address liability issues that may arise from incidents arising on leased property.” (Id. [emphasis added].)
Significantly, the Second OTARD Order permits tenants who occupy outdoor space to install section 207 reception devices without the landlord’s permission. However, the Second OTARD Order did not change the rules to cover common property and restricted access property.[2]
In this case, the premises do not have a balcony, terrace, railing or other exclusive area to bring it under the exception of section 207. Rather, the credible evidence presented at trial showed that the dish is attached to a piece of wood bolted to the window guard. The question then becomes is a window guard an area where a tenant has exclusive use and control. In a decision of first impression concerning a satellite dish, the housing court held
“that the window guard, although attached to the *783 window frame, in [sic] not within the exclusive use or control of Respondents. It constitutes common property, in which Respondent has access but not possession or exclusive rights of use or control. Both the Federal courts and New York courts have noted a clear distinction between the installation of antennas or aerials on common property which is prohibited or in areas within the exclusive possession and control of the Tenant which would be permitted.” (2682 Kingsbridge Assoc. v Martinez, NYLJ, Jan. 22, 2003, at 20, col 6 [Civ Ct, Bronx County].)
Except for Martinez there are no reported New York cases regarding the exterior installation of satellite dishes in a residential premises. As in Martinez, this court is guided by the case law addressing the installation of television antennas and aerials, which hold that such installation is an unauthorized intrusion upon the landlord’s property that could result in the tenant’s eviction. (See Kaplan v Sessler, 197 Misc 270 [App Term, 2d Dept 1950] [maintenance of television aerial or wire from apartment window to roof a cause for removal of tenant]; Kolodney v Shapiro, 100 NYS2d 70 [App Term, 1st Dept 1950] [a small claims action holding that defendant could remove plaintiffs roof antenna after reasonable notice]; Prestipino v Matarazzo, 99 NYS2d 606 [App Term, 1st Dept 1950]; Goldstein v Alweiss, 196 Misc 513 [App Term, 1st Dept 1949] [erection of television aerial on outside frame of window unauthorized intrusion on landlord’s property]; Leona Bldg. Corp. v Rice, 196 Misc 514 [App Term, 1st Dept 1949]; 349 E. 19th St. v Bernstein, 99 NYS2d 299 [Sup Ct, NY County 1950] [erection of television antenna on roof an intrusion].)
It can be argued that the aforementioned case law is 50 years old, decided before the onset of current technology and passage of section 207 in 1996. However, it remains that when section 207 was amended renters who did not lease outside space were clearly excluded. Indeed, the Commission noted in the Second OTARD Order that the “new rules permit the installation of Section 207 devices inside rental units and anticipate the development of future technology that will create devices capable of receiving video programming signals inside buildings.” (Building Owners & Mgrs. Assn. Intl. v Federal Communications Commn., 254 F3d 89, 93 n 4 [2001], quoting Second OTARD Order.) Apparently, renters who do not occupy outdoor space must await improved reception apparatus which functions from inside the premises.
*784 After review of the applicable law, the court is constrained to find that the window guard is an “area” outside of the premises where the tenant has access, but not possession or exclusive use and control. Therefore, if there were no other questions to resolve, petitioner would be awarded a judgment of possession and respondent would be afforded an opportunity to cure. However, the facts here may be distinguished from those in Martinez, where the satellite dish had been attached to the window guard in April 2002 and the holdover proceeding was commenced less than six months later, in September 2002. By contrast, the instant proceeding was commenced in July 2002, more than 4V2 years after the dish was installed. Further, unlike the facts herein, in Martinez there was no allegation that petitioner knew about the satellite dish and acquiesced to its installation. Consequently, the court now addresses respondent’s defense that petitioner waived its right to compel removal of the dish.
Waiver is “[t]he intentional or voluntary relinquishment of a known right * * * whether conferred by law or by contract, with full knowledge of the material facts, [where one] does or forbears to do something * * * which is inconsistent with the right, or his intention to rely upon it.” (Black’s Law Dictionary 1092 [abridged 6th ed 1991].) In addition, the “general rule is that acceptance of rent with knowledge of conduct violative of the lease constitutes a waiver by the landlord of the default even if the lease contains a nonwaiver provision.” (Malloy v Club Marakesh, 71 AD2d 614, 616 [2d Dept 1979] [citations omitted].)
In the instant case it is undisputed that respondent has maintained the satellite dish outside the window of her apartment since November 1997. It is further undisputed that the Director of Operations and other employees of petitioner were aware of the dish since that date and that they inspected the manner of the device’s installation. Further, respondent alleges and petitioner does not dispute that petitioner’s agent annually inspected every room of the apartment, including the window guard and satellite dish, as part of the recertification process. Additionally, it is undisputed that the building has been cable accessible for the past two years.
Although the rider to respondent’s rent-stabilized lease includes a nonwaiver clause, petitioner did not proffer this clause or any other argument to refute respondent’s defense of *785 waiver.[3] Moreover, petitioner presented no evidence that the satellite dish poses a danger to other tenants or pedestrians on the sidewalk, or that any damage to petitioner’s property has been identified.
Indeed, the facts before the court are analogous to the facts in Fanchild Invs. v Cohen (43 Misc 2d 39 [Civ Ct, Bronx County 1964]), where respondent installed a washing machine in violation of the lease without the written consent of the petitioner. In Fanchild petitioner’s employees visited the apartment, in particular the kitchen where the washing machine was located, many times to collect the rent. Despite the nonwaiver clause in respondent’s lease, the court held that petitioner waived its right to evict the tenants because they had used the washing machine for approximately two years with the knowledge of petitioner and its agents. (See also 601 W. Realty v Grigoroff, NYLJ, Aug. 30, 2000, at 23, col 4 [Civ Ct, NY County] [owner found to have waived his right to maintain a proceeding after he collected rent and acquiesced in tenant’s keeping a washing machine for 16 years].)
For the foregoing reasons, the court finds that petitioner acquiesced in respondent’s installation of the satellite dish, unduly delayed in seeking its removal, and therefore waived its right to seek enforcement of the lease clause prohibiting installation of an aerial at the premises. Therefore, it is ordered that the petition is dismissed with prejudice.

. Tape 30499 commence counter at 1225.

. A group of building owners, realtors and home builders challenged the Federal Communications Commission’s authority to include renters into the group of viewers who were permitted to install section 207 devices where they rented space. (Building Owners & Mgrs. Assn. Intl. v Federal Communications Commn., 254 F3d 89, 92 [DC Cir 2001].) The case holds that the Communications Act of 1934 granted the Federal Communications Commission the authority to promulgate the First and Second OTARD Orders, i.e., to issue regulations concerning viewers’ ability to receive over-the-air reception signals, and to include renters in that class of viewers.

. Paragraph 28 of the lease provides, in pertinent part:
“A. Even if Owner accepts your rent or fails * * * to take action against You when You have not done what You have agreed to do in this lease, the failure of Owner to take action or Owner’s acceptance of the rent does not prevent Owner from taking action at a later date * * *
“B. Only a written agreement between You and Owner can waive any violation of this Lease * *